721 A.2d 758 (1998)
Jesse Y. HARRIS, Plaintiff,
v.
BOROUGH OF FAIR HAVEN, Defendant.
Superior Court of New Jersey, Chancery Division, Monmouth County.
Decided September 25, 1998.
Jesse Y. Harris, pro se.
Bernard M. Reilly, Red Bank, for defendant (Dowd & Reilly, attorneys).
FISHER, P.J.Ch.
From approximately 1851 until 1873 a church, known as the St. James A.M.E. Zion Church, was located on a narrow private lane known as Brown's Lane in the Borough of Fair Haven. This private lane apparently has existed since the 1840s when it was cut into a parcel owned by Jacob Brown. The church was built on what is now part of Block 62, Lot 22. In February 1873 the church was destroyed by fire and never rebuilt.
It appears, also, that somewhere in the church yard was located a small cemetery, which plaintiff refers to in his complaint as "an ancient African-American burial ground". There are no headstones located at this site, although some information provided by the parties suggests the location of a cemetery in this vicinity. For example, plaintiff has alluded to testimony that the remains of two individuals were dug up in *759 the area approximately 60 years ago. For purposes of the present proceeding, the court will assume that a graveyard was located on or about the present Lot 22 in the middle part of the nineteenth century. Shortly after the destruction of the church in 1873 the property was conveyed to and been held by private owners.
A subdivision application in 1989 was granted and led to the reconfiguration of the property in question. After subdivision approval, but before construction at the site, some parties raised the fact that a graveyard, then (and now) unmarked, was located in the vicinity. The precise location of this graveyard remains uncertain, but some information reveals that it was probably located on Lot 22. At that time, Fair Haven stayed the building permit for Lot 22 and a limited historical and archaeological investigation was performed by the Cultural Resource Consulting Group. The cost of this investigation was borne equally by the then owners of Lot 22 and Fair Haven. According to the opposing certification, that study "did not definitively locate any graves, but concluded burials probably did exist in some uncertain location on or about Lot 22." Reilly Certification, ¶ 6. As a result, Fair Haven and the owner agreed that a borough official would stand by during excavation for the new house on Lot 22 and, if remains were found, the job would stop pending further consideration. Id. at ¶ 7. No remains were located by the time construction was finished.
Of additional interest is the filing of a deed of easement dated November 9, 1992, between the owners of Lots 22, 23 and 25, as grantors, and the Shrewsbury Avenue A.M.E. Zion Church, as grantee. That conveyance granted to the latter an easement to an area within three feet of the southeasterly corner of the property in question for the purpose of the placing and maintaining of a monument of specific dimensions which would contain the following wording:
In this vicinity on historic Brown's Lane stood the St. James A.M.E. Zion Church during the 1840's to 1860's. This monument is dedicated to the memories of our deceased members of that period.
Shrewsbury Avenue A.M.E. Zion Church
Fisk Chapel A.M.E. Church
This monument was never constructed.
There is a house that has existed on an adjacent lot, Lot 23, for approximately 100 years, and is presently owned by John Ridgeway (Ridgeway). Earlier this year, Ridgeway applied to the Fair Haven Zoning Board of Adjustment (the board) for a variance in order to construct an addition to his home. At a number of meetings, over the course of months, the board heard the objections of several interested parties including the owner of Lot 22 and plaintiff herein. The board heard proofs concerning the possibility that graves may have been located on the present Lot 23 and that the construction in question might impact upon the graveyard. Plaintiff has referred, in his moving papers, to Ridgeway having stated under oath at some proceeding that he unearthed a grave marker in his driveway in 1993. Harris Certification, ¶ 1. Nevertheless, it appears that Ridgeway has contended before the board[1] that there is insufficient proof to demonstrate that graves were ever located on the present Lot 23. Reilly Certification, ¶ 8. Ultimately, the board voted in June 1998 to approve Ridgeway's application, although it apparently has yet to adopt a resolution to that effect because it may impose conditions, including the monitoring of construction in case human remains are located. Reilly Certification, ¶ 8. The board's next meeting is scheduled for October 1, 1998, at which time it appears that it may issue a resolution concerning Ridgeway's application.
Based upon the sketchy physical and anecdotal evidence as to the existence and location of a cemetery off Brown's Lane, plaintiff seeks this court's intervention. The thrust of plaintiff's complaint appears to be twofold.
Plaintiff, first, appears to complain that the board is about to formally grant approval of construction on Ridgeway's property without giving due regard for its potential impact on *760 the graveyard which may or may not be located on Ridgeway's property. It is clear that plaintiff is premature with regard to any such contention since the board has not yet formally resolved the question of whether Ridgeway should be permitted to undergo the proposed construction or, if so, under what conditions. In this respect, plaintiff is obviously seeking relief in lieu of prerogative writs. Such controversies must be commenced in the Law Division, see R. 4:69-1, and do not ripen into justiciable disputes so long as there may be a remedy in the municipal or administrative body:
Except where it is manifest that the interest of justice requires otherwise, actions under R.4:69 shall not be maintainable as long as there is available a right of review before an administrative agency which has not been exhausted.

[R.4:69-5.]
Here, while it may be a foregone conclusion that the board will approve the construction, until the board actually and finally acts the controversy remains, for purposes of the superior court, academic.
Plaintiff also appears to seek mandatory injunctive relief against Fair Haven which, notwithstanding the action of the board, would require Fair Haven to affirmatively act to protect the graveyard in question. Since the court is satisfied that municipalities are under no such mandatory obligation, that aspect of the plaintiff's claim will also be dismissed. There is no question, and plaintiff is rightfully concerned, that it is something of a disgrace that ancient cemeteries in the State of New Jerseyand presumably elsewherehave either fallen into disrepair or have entirely vanished from sight. Our Legislature recognized this at the time it adopted the "Historic Cemeteries Act" (N.J.S.A. 40:10B-1 to -3)(the Act):
The Legislature finds that within the State of New Jersey, there are many historic cemeteries in which are interred the bodies of citizens who settled and first developed the colonial lands of East Jersey and West Jersey, fought to secure and preserve freedom and liberty, contributed to the historic and cultural development and evolution of the State, its counties and municipalities, and participated in events of historical and cultural importance and significance.
The Legislature further finds that because of a lack of funds available to restore, maintain and preserve many of these historic cemeteries, they have fallen into disrepair, disorder and decay.
The Legislature further finds that such cemeteries serve to remind us of our cultural and historical heritage, rekindle an awareness of the difficult struggles and unique achievements of preceding generations, and renew, in each succeeding generation, an appreciation and an understanding of the patterns of our State and local history.

[N.J.S.A. 40:10B-2.]
Despite recognizing the problem, the Historic Cemeteries Act did little to provide a remedy. Rather, the Act contains the Legislature's declaration that "it is altogether fitting and proper, and in the public interest, to enable local governmental units to assist in the restoration, maintenance and preservation of such cemeteries." N.J.S.A. 40:10B-2 (emphasis added). The Act, thus, permits the governing body of the county to annually appropriate an amount not to exceed $10,000, and the governing body of a municipality to appropriate an amount not to exceed $3000, for such purposes provided, however, that no such body expend annually an amount in excess of $500 to restore, maintain or preserve any one cemetery. N.J.S.A. 40:10B-3.
It is apparent that while the Legislature was concerned about the problem, all that it did was imbue counties and municipalities with the power to make expenditures for the restoration of such cemeteries. It is clear that the Historic Cemeteries Act does not require those governmental bodies to do anything at all and the Act certainly does not require the state government to do anything. Accordingly, viewing plaintiff's action in the light of this Act, the relief sought cannot issue without the finding of a duty on the part of Fair Haven to provide funds for the restoration of the cemetery in question. Since the Act places no such obligation on *761 municipalities such as Fair Haven, and since the court has not been provided with any evidence to suggest that Fair Haven has, in the past, provided funds to restore, maintain or preserve other cemeteries, the court can find no duty on Fair Haven's part to affirmatively preserve this vanished cemetery, as regrettable as that result may historically be.[2]
A search of other legislation is equally unavailing in terms of locating a duty on the part of Fair Haven to affirmatively protect this graveyard. While extolling the desire to preserve historic cemeteries, on one hand, the Legislature has also provided for the converting of old burying grounds or cemeteries' into parks or other public purposes when such cemeteries have been neglected or have become nuisances. See N.J.S.A. 40:60-25.33 to -25.37. Such circumstances may result in the disinterring and removal of remains upon the following of the legal processes referred to in N.J.S.A. 40:60-25.37.
Of further interest is the fact that the Legislature, in 1971, enacted the New Jersey Cemetery Act. N.J.S.A. 8A:1-1 to 12-6 (act). That act created the New Jersey Cemetery Board which has the power to administer the act and which possesses general supervision and control over all cemetery companies. N.J.S.A. 8A:2-2. This act, however, provides no basis for the relief sought by plaintiff. Rather, the act appears to only have prospective effect in that it prohibits the establishment of any cemetery after its effective date (February 29, 1972) by anyone other than the federal government, the State or any of its subdivisions, a religious corporation or by a cemetery company organized in accordance with the act. N.J.S.A. 8A:3-1. The Cemetery Board, with the assistance of the Attorney General of this State, can prevent graveyards from falling into disrepair through the vigorous enforcement of the act. See N.J.S.A. 8A:2-3. But there is nothing in the act itself which would appear to allow the Cemetery Board or the Attorney General to seek a remedy for the situation presented. It goes without saying that the purveyor of the graveyard at the time it fell into disrepair is long gone and no remedy may be sought against any such persons or entities, even if it could be assumed that the act has retroactive effectwhich it does not. In short, while the Legislature created a mechanism to avoid the loss of graveyards through abandonment or lack of maintenance at the present and in the future, it has not created a mechanism by which previously abandoned cemeteries may be resurrected except to the limited extent referred to in the Historic Cemeteries Act.
The New Jersey Cemetery Act also indicates the Legislature's intent that "[n]othing in th[e] act shall prohibit the Attorney General from exercising any of the powers heretofore exercised by him regarding cemeteries." N.J.S.A. 8A:2-4. Those powers were neither defined nor disclosed by this legislation, although a fair guess might be that the Legislature was referring to the authority of a prosecutor to seek the unearthing of human remains for the purpose of investigating or prosecuting a criminal offense. See N.J.S.A. 40A:9-50.[3] Certainly *762 that authority is not implicated by the present circumstances.
It is true, also, that the Superior Court possesses equitable jurisdiction, as a general matter, over the dead. This means, without the need for further delineation, that once a body is buried it is deemed to be in the custody of the law and the removal or disturbance of those remains lies, when not otherwise provided by legislation, within the court's equitable powers the invocation of which infrequently occurs. The circumstances which will compel a court of equity to act in this regard vary depending upon whether the moving party seeks to vindicate a public or private right. See, e.g., In Re Sheffield Farms Co., 22 N.J. 548, 126 A.2d 886 (1956); Felipe v. Vega, 239 N.J.Super. 81, 570 A.2d 1028 (Ch.Div.1989). Here, the equitable power of a court of equity to allow human remains to be disinterred or otherwise disturbed is not implicated. Rather, what plaintiff seeks from this court, as the claim is understood, is the issuance of mandatory injunctive relief which would compel Fair Haven to prohibit any action by an owner, or owners, of private propertycontaining a graveyard which has long since fallen into disrepair or disarrayfrom otherwise lawfully making use of that property. That is a far cry from the traditional power of a court of equity to prohibit or permit the disinterment of the remains of a deceased person. This court knows of no authority (and believes it inappropriate to announce such a rule) which would compel Fair Haven to prohibit some use of real property owned by a citizen, which is otherwise lawful and within the municipality's discretion to permit, because a graveyard long since abandoned and forgotten, may have been located there. It is apparent that no party or entity involved has an interest or desire to disturb any human remains and it also seems apparent that Fair Haven will, as it has in the past, place conditions on the construction in order to avoid any such likelihood. Notwithstanding the invoking of any conditions on any permit which may issue to Ridgeway, this court will not compel Fair Haven to exercise its discretion in a particular way under the present circumstances. Nothing that has been provided in this matter provides any legal or equitable basis by which this court could or should enjoin Fair Haven, or the board, from acting favorably or, for that matter unfavorably, with regard to Ridgeway's application for a variance in order to undertake certain construction on his property. Those governmental bodies have the right to act in a lawful manner with respect to Ridgeway's application in the first instance without the spectre of this court's prior intervention.
Accordingly, for the reasons expressed above, the court rejects the notion that it is authorized, under the circumstances alleged, to compel Fair Haven to affirmatively act to protect an abandoned graveyard (which may not even be on the property of the zoning board applicant in question). In that regard, plaintiff's complaint is dismissed. To the extent plaintiff seeks relief in lieu of prerogative writs[4] with regard to the anticipated action of the board with respect to that application, plaintiff's claim is premature and his complaintinsofar as it seeks that relief is dismissed without prejudice.[5]
NOTES
[1] Plaintiff did not join Ridgeway as a party to this action despite the fact that the issuance of the relief sought would very well impact on Ridgeway's rights.
[2] It should also be observed that the Historic Cemeteries Act applies only to "historic cemeteries" which are, first, defined to include those cemeteries which are not owned by the State, a county, municipality, or religious corporation or association. The ownership of the cemetery that was once located on Brown's Lane is uncertain. Further, the phrase "historic cemetery" relates only to cemeteries "in which are interred the remains of prominent citizens or residents of the State or of the Colony of East Jersey or the Colony of West Jersey, or veterans of the Colonial Wars, the War of Independence, the War of 1812, the Mexican-American War, the Civil War, the Spanish-American War, or World War I." It would appear, from the sketchy proofs submitted, that the most that can be inferred on this factual record is that anyone buried on the premises in question died between the 1840s and 1873. That would appear to eliminate the likelihood that anyone interred there fits most of the descriptive language of the statute. But it does not entirely eliminate such a conclusion. Indeed, under the present circumstances, it would appear unlikely that the true identity of anyone who was buried there will ever become known. In light of the utter absence of clear proof, the court appears spared the unhappy opportunity to determine whether the citizens who may be buried there should be viewed as "prominent" citizens or residents or what the Legislature intended by that phrase.
[3] The Superior Court, upon the application of a proper party, may order the disinterment of any dead body, where an investigation of the cause of death is authorized, under the supervision and direction of the county medical examiner and authorize said official to remove the body to a public morgue for the purpose of examination of autopsy. The court shall direct the giving of or dispensing with notice.

[Id.]
[4] The court expresses no opinion on whether this plaintiff has standing to bring such an action. Indeed, while it was not raised and in light of the court's ruling set forth herein it is not necessary to be decided, the court expresses no opinion on whether plaintiff had standing to assert claims or vindicate any alleged rights with respect to this abandoned graveyard. In the same vein, the court expresses no opinion on whether plaintiff should have been required to join either the board or Ridgeway as parties to this action.
[5] Any further action in that sense should be hereafter commenced in the Law Division pursuant to R.4:69.